**Michael E. MOECKER, as Assignee for the Benefit of Creditors for Vehicle Safety Systems, Inc., Plaintiff,**

v.

**HONEYWELL INTERNATIONAL, INC. f/k/a AlliedSignal Inc., a New Jersey Corporation authorized to do business in the State of Florida, et al., Defendants.**

No. 5:97CV329OC10GRJ.

United States District Court,
M.D. Florida,
Ocala Division.

April 4, 2001.

R. Hewitt Pate, John S. Martin, Hunton & Williams, Richmond, VA, Marty Leonard Steinberg, Barry R. Davidson, D. Bruce Hoffman, Hunton & Williams, Miami, FL, for Honeywell, International, Inc., f/k/a AlliedSignal, Inc., defendant.

Ladd H. Fassett, Fassett, Anthony & Taylor, P.A., Orlando, FL, for David Arnold, Michael E. Moecker, as Assignee for the Benefit of Creditors for Vehicle Safety Systems, Inc., plaintiffs.

## ORDER

HODGES, District Judge.

This case comes before the Court for consideration of five reports and recommendations issued by the United States Magistrate Judge (Docs.176, 190, 192, 200, 217). Each report and recommendation is ripe for consideration, as the parties have either filed objections or the time for objecting has elapsed.

Accordingly, upon an independent determination, it is ordered that:

(1) the report and recommendation of the Magistrate Judge entered on September 20, 2000 (Doc. 176) is adopted, confirmed and made a part hereof, and Defendant Honeywell's Motion to Dismiss Counts II, III, V, & VI of the

Second Amended Complaint (Doc. 40) is DENIED;[1]

(2) the report and recommendation of the Magistrate Judge entered on January 17, 2001 (Doc. 190) is adopted, confirmed and made a part hereof, the objections filed by Plaintiff Moecker (Doc. 194) and Defendant Honeywell (Doc. 196) are OVERRULED, and

(a) Defendant Honeywell's Motion for Summary Judgment (Doc. 62) is DENIED;

(b) Defendant Honeywell's Motion for Summary Judgment (Doc. 62) as to the claims for monopolization and attempted monopolization under § 2 of the Sherman Act, asserted in Count III is GRANTED;

(c) Defendant Honeywell's Motion for Summary Judgment (Doc. 62) as to the claims for monopolization and attempted monopolization under Florida law asserted in Count VI is GRANTED; and

(d) Defendant Honeywell's Motion for Summary Judgment (Doc. 62) as to the claims for conspiracy to monopolize asserted in Count III under § 2 of the Sherman Act and asserted in Count VI under the Florida law is DENIED; and

(3) the report and recommendation of the Magistrate Judge entered on January 30, 2001 (Doc. 192) is adopted, confirmed and made a part hereof, the objections filed by Defendant Honeywell (Doc. 202) are OVERRULED, and the Plaintiff's Motion in Limine as to Arnold's Conviction (Doc. 104) is GRANTED. The Defendant shall be prohibited from referring, either directly or indirectly, to Arnold's 1983 conviction of distribution and possession with intent to distribute cocaine hydrochloride;

(4) the report and recommendation of the Magistrate Judge entered on February 12, 2001 (Doc. 200) is adopted, confirmed and made a part hereof, the objections filed by the Plaintiff (Doc. 211) are OVERRULED, and the Plaintiff's Motion for Partial Summary Judgment Determining Liability Under Robinson–Patman Act (Doc. 72) is DENIED;

(5) the report and recommendation of the Magistrate Judge entered on March 8, 2001 (Doc. 217) is adopted, confirmed and made a part hereof, the objections filed by the Defendant (Doc. 221) are OVERRULED, and Honeywell's Motion in Limine to exclude the testimony of Dr. Henry Fishkind (Doc. 67) is DENIED.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION[1]

JONES, United States Magistrate Judge.

Pending before the Court are Honeywell's Dispositive Motion for Summary Judgment (Doc. 62) and Memorandum In Support of Honeywell's Dispositive Motion For Summary Judgment. (Doc. 99.) Honeywell has also filed three appendices in support of its request for summary judgment. (Docs. 63, 64, & 65.) Plaintiff, Vehicle Safety Systems, Inc. ("VSSI") and counterdefendant, David Arnold ("Arnold") have filed a joint Memorandum Of

---

1. Neither party objected to the report and recommendation of the Magistrate Judge (Doc. 176) and the time for objecting has elapsed.

1. Specific written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, M.D. Fla., within ten (10) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

Law In Opposition To Defendant's Motion For Summary Judgment (Doc. 137) and an appendix. (Doc. 138.) The Court heard oral argument on the pending motion on September 6, 2000 in conjunction with a *Daubert* hearing regarding the expert testimony of Plaintiff's expert, Dr. Henry Fishkind. During the hearing additional issues were raised and, accordingly, the Court requested that the parties provide supplemental briefs on the issue of the effect, if any, of the definition of the relevant market offered by Dr. Fishkind at the hearing. Honeywell filed its supplemental memorandum (Doc. 178) to which VSSI responded. (Doc. 179.) Honeywell thereafter requested permission to file a reply, and on November 1, 2000 Honeywell filed its reply memorandum (Doc. 183) after receiving permission form the Court. With permission from the Court VSSI filed a brief reply to Honeywell's reply. (Doc. 188.) The matter is now ripe for disposition.

Upon due consideration and for the reasons discussed below, the Court concludes that Honeywell's Motion For Summary Judgment is due to be **GRANTED in part** and is due to be **DENIED in part.**

## I. *BACKGROUND FACTS*

The pleadings, memoranda, affidavits, and other evidence in the record, construed in the manner most favorable to the Plaintiff, disclose the following details.

VSSI is a former Honeywell customer that sold seat belts and related components ("safety restraints") to companies that converted vans for custom uses. The plaintiff is Michael Moecker, who represents the interests of the creditors of VSSI, pursuant to an assignment for the benefit of creditors proceeding filed in the Fifth Judicial Circuit Court for Marion County, Florida. VSSI has brought claims for violation of an alleged exclusive distributorship contract, as well as antitrust claims under the Robinson Patman Act, 15 U.S.C. § 13(a) and the Sherman Act sections one and two, 15 U.S.C. §§ 1 and 2 and related state antitrust claims.

This suit involves AlliedSignal's Safety Restraint Division,[2] which manufactured seat belts for use by the van conversion industry. Van conversion companies buy shell vans from major automobile manufacturers and convert them into conversion vans. The seat belts sold by AlliedSignal for use in custom vans are modifications of the seat belts sold by AlliedSignal to the major automobile manufacturers. Safety restraint manufacturers sell primarily to original equipment manufacturers like Ford or General Motors. Only a small portion of their sales are to companies that make conversion vans.[3]

In 1991 Honeywell was selling to one distributor to the van conversion industry, Lavanture Products Corporation ("Lavanture"). During this time frame AlliedSignal sold seat belts to manufacturers of about fifty percent of the custom vans manufactured in the United States. (Doc. 76, Ford Dep. at 21.) In late 1991 Honeywell also began selling seat belts for the van conversion industry through a second distributor, VSSI. The relationship took on a new dimension in June, 1992 when a "representation agreement" was signed between VSSI and a corporation called Northeast Products. (Doc. 97, Tab A.)

---

**2.** AlliedSignal changed its name to Honeywell International, Inc. during the course of these proceedings and, accordingly, "AlliedSignal" and "Honeywell" are used interchangeably throughout this report and recommendation.

**3.** For example, in 1993, Honeywell sold $345 million of automotive parts to its largest OEM customers in North America and only $15 million to its North American van conversion customers. (Doc. 65, Tab F, Ford Decl. at ¶ 5.)

Northeast Products was a company formed by William Rumancik, the husband of Julie Rumancik, who was the Honeywell account manager for VSSI's account. Pursuant to the terms of the Representation Agreement, VSSI agreed to pay Northeast Products a designated portion of its profits. (Doc. 97, Tab A.) Between August 1992 and May 1996 VSSI paid Northeast Products $204,966.34, which funds were distributed to Robert Zimmerman, the Honeywell sales manager and Julie Rumancik, the Honeywell account manager. (Doc. 63, Ex. 18.) While the parties vigorously dispute whether the payments were bribes paid to induce Honeywell to continue to do business with VSSI and grant VSSI favorable treatment, or whether the payments were extorted from VSSI in order for VSSI to continue to do business with Honeywell, there does not appear to be a serious dispute that Northeast Products did not provide any customers to VSSI and otherwise did nothing to earn the funds paid to it by VSSI.

Notwithstanding how the payments to Northeast Products are characterized, after the execution of the Representation Agreement, VSSI's credit terms were favorably increased from $60,000 to $200,000 and its payment terms were extended from 30 days to 60 days. (Doc. 63, Ex. 108.) Additionally, Honeywell ignored the credit limit and permitted VSSI to increase its receivable balance to $3.8 million by September 1993.

By the fall of 1993 Honeywell's seat belts were sold to ninety-two percent of the van conversion market. Of these sales VSSI sold Honeywell's seat belts to sixty-seven percent of the market while LaVanture's share had dropped from fifty percent to twenty-five percent of the van conversion market. (Doc. 63, Ex. 7 at 3.)

By the fall of 1993 the large receivable of VSSI had been brought to the attention of Honeywell management. The parties'

characterization of the events that ensued thereafter is starkly in contrast.

Honeywell claims that it "struggled for years to help VSSI remain in business and pay down the large receivable that had been built up." (Doc. 99, at 20.) In contrast, VSSI argues that Honeywell made a "secret decision to downsize VSSI in such a manner so its customers would be transferred to Lavanture" (Doc. 137, at 8) and it could recoup as much of the receivable as possible before VSSI went out of business. Whatever the explanation, in 1994 VSSI lost business to Lavanture because VSSI could not be competitive on price. The parties again offer substantially different explanations for the loss of business.

VSSI contends that Lavanture was receiving lower prices than it on parts from Honeywell and that Honeywell improperly allowed Lavanture to buy parts made from tooling paid for by VSSI. Honeywell, while implicitly acknowledging that there was a difference in price between that given to Lavanture and VSSI, contends that Lavanture received a lower price rather than VSSI being charged a higher price. According to VSSI, the motivation for the favorable pricing given to Lavanture was the result of yet another agreement with Northeast Products. In January 1995, Lavanture executed an "Independent Contractor Agreement" with Northeast whereby Lavanture agreed to retain Northeast Products as an independent contractor to "identify new markets and new customers" in return for "commissions" equal to 5% of the net sales price charged to customers purportedly developed by Northeast Products. (Doc. 138, Ex. 26.) As a result of the payments under this agreement Zimmerman and Julie Rumancik caused certain prices charged by Honeywell to Lavanture to be lowered. VSSI argues that as a result of these price breaks eventually the VSSI customer base switched to La-

vanture. According to VSSI, its weakened financial situation affected its relationship with Honeywell as well as with the other companies with whom it did business.

Honeywell offers a different explanation. Honeywell characterizes its efforts between 1995 and 1997 as an effort to help VSSI remain in business and pay down its substantial debt owed to Honeywell. While acknowledging VSSI's precarious financial situation, Honeywell stresses that VSSI's poor sales performance was the result of a downturn in the industry[4] and that VSSI's ultimate demise was due to the actions of companies other than Honeywell.

Whatever the cause for VSSI's downturn, VSSI went out of business in early 1997. On June 18, 1997, VSSI's assets were assigned to Moecker for the benefit of VSSI's creditors, of which Honeywell is the largest.

## A. *The Antitrust Claims*

VSSI asserts in 1993 and 1994 Honeywell and Lavanture secretly conspired to eliminate VSSI as a distributor in such a manner so as to transfer VSSI's customers to Lavanture in order to protect Honeywell's monopoly control of the market. VSSI contends that the favorable pricing and benefits extended to Lavanture constitute an illegal agreement to restrain trade in violation of § 1 of the Sherman Act. VSSI also claims this same conduct constitutes conspiracy to monopolize in violation of § 2 of the Sherman Act. Alternatively, VSSI asserts that even without the conspiracy between Honeywell and Lavanture the conduct of Honeywell as a single firm is sufficient to establish claims for monopolization and attempted monopolization under § 2 of the Sherman Act.

Although there is considerable confusion and disagreement regarding the relevant market, *see, infra* pp. 1302–05, VSSI contends that the relevant market, which has been monopolized or within which trade has been restrained, is "safety restraint systems for the van conversion industry in the U.S." VSSI goes on to argue that both intrabrand and interbrand competition was harmed by the conduct of Honeywell.

Regarding harm to intrabrand competition VSSI's theory is that intrabrand competition was harmed because competition between Lavanture and VSSI at the distributor level was eliminated when Lavanture became the sole distributor of Honeywell.

VSSI further posits that interbrand competition was harmed in a number of ways. First, VSSI contends that by slowly allowing the customers of VSSI to switch to Lavanture, rather than simply terminating VSSI, Honeywell precluded other manufacturers from considering entering the market. Secondly, as an analogue to this argument, VSSI contends that had Honeywell simply terminated VSSI while it had 67% of Honeywell's business, rather than allowing its customer base slowly to be switched to Lavanture, VSSI could have solicited a distributorship with another manufacturer. Lastly, VSSI concludes that the elimination of VSSI from the market removed the downward pressure on prices in the market which had resulted from the competition between VSSI and Lavanture. This alleged downward pressure in price prevented Honeywell from

---

4. In the mid 1990s the sales of sport utility vehicles, minivans and "factory custom vans" began to increase thus cutting into the market of van conversions. From 1994 to 1998 the number of sales of conversion vans declined each year and only 148,600 conversion vans were sold in 1998 compared to 259,600 sold in 1994, the peak of sales for conversion vans in the 1990s. (Doc. 129, Ex. A, Fishkind Report at 6).

being able to raise prices according to VSSI's economic theory.

VSSI goes on to argue that interbrand competition at the distribution level, as well as at the customer level, was similarly harmed. Because of Honeywell's control of a large share of the market, VSSI contends new distributors were foreclosed from a source of supply to be able to compete in the market. At the customer level the lack of competition allegedly harmed the van converters who now incur higher costs with significantly less service.

Honeywell challenges each of VSSI's antitrust assumptions and claims. Honeywell asserts that the relevant market is the safety restraint market and not simply safety restraints sold to the van conversion industry. Further, Honeywell argues that VSSI's expert initially defined the market as the "manufacturers" of safety restraint systems for the van conversion industry.

According to Honeywell, there is no violation of the antitrust laws based on the conduct alleged by VSSI because there is no harm to interbrand competition at the manufacturing level. At the *Daubert* hearing on September 6, 2000 VSSI's expert asserted that the market was the distribution market for the sale of safety restraint systems to the van conversion industry. Honeywell theorizes that if this is the relevant market it cannot be liable for monopolizing, attempting to monopolize or conspiring to monopolize that market because Honeywell does not compete in the distribution market, but only competes in the manufacturing market.

Honeywell asserts that if the market definition is the distribution market, as expressed by VSSI's expert at the *Daubert* hearing, the theories alleged by VSSI amount to nothing more than a classic case of a dealer termination by a manufacturer. An agreement between a manufacturer and a distributor to terminate another distributor is not, according to Honeywell, an antitrust violation in the absence of a further agreement to fix minimum resale prices. Lastly, Honeywell argues that if the market is defined as the distribution market VSSI lacks antitrust standing to bring its claims because the alleged harm to competition affected the van converters and van buyers and not the distributors like VSSI.

**B. *Honeywell's Other Summary Judgment Arguments.***

In addition to its attacks on VSSI's antitrust theories, Honeywell contends that the scheme whereby payments were made by VSSI to Northeast Products was "facilitated and encouraged by VSSI and Lavanture, without the knowledge of and against the interests of Honeywell." (Doc. 99 at 24.) Based on this assumption Honeywell contends that VSSI cannot recover on its claims because Honeywell cannot be held vicariously liable for its employees' unlawful conduct under principles of agency law. Second, Honeywell argues that Plaintiff's recovery is barred by the doctrine of *in pari delicto*, or "complete participation." Lastly, Honeywell concludes that the contract claim in the Second Amended Complaint is unenforceable because the alleged contract is "sufficiently permeated with fraud and illegality" to bar recovery.

VSSI counters that under agency principles Honeywell is responsible for the actions of its employees, Robert Zimmerman and Julie Rumancik and, accordingly, Honeywell is chargeable with their conduct. At a minimum, VSSI argues that there are numerous factual issues concerning whether the actions of the Honeywell employees were within the course and scope of their employment with Honeywell. Alternatively, VSSI asserts that Honeywell is responsible for the actions of its employees and the breach of contract claim is enforceable because Honeywell

ratified the actions of its employees and is estopped to assert these defenses.

## II. *Summary Judgment Standard*

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett,* the moving party bears the initial burden of informing the court of the basis of the motion and of establishing the nonexistence of a triable issue of fact. *See* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth,* 833 F.2d 1525, 1528 (11th Cir.1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* at 587, 106 S.Ct. 1348.

## III. *LEGAL ANALYSIS*

### A. *Section One Of The Sherman Act*

VSSI claims that the alleged secret agreement between Lavanture and Honeywell to give Lavanture lower prices and favorable benefits was an illegal restraint of trade designed to slowly drive VSSI out of business and transfer all of VSSI's business to Lavanture in order to protect Honeywell's monopoly control of the market. According to VSSI this conduct constitutes a violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

■ Section one of the Sherman Act literally prohibits every contract, combination or conspiracy in restraint of trade, but this is confined to only such concerted activity as unreasonably restrains trade. *See, Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). To prevail VSSI must show that Honeywell (1) entered into "a contract, combination or conspiracy," which was (2) "in restraint of trade or commerce" and (3) that it was damaged by the violation. *See, Storer Cable Communications, Inc. v. City of Montgomery, Ala.,* 826 F.Supp. 1338, 1348 (M.D.Ala.1993).

Regarding the first element, § 1 of the Sherman Act does not prohibit independent business decisions but only prohibits concerted action and, thus, requires some agreement express or implied between two or more persons. *See, Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Therefore, as a threshold matter, there must be an agreement to restrain trade.

The heart of VSSI's claim is that Honeywell conspired with Lavanture to give Lavanture lower prices so that Lavanture could acquire the customers of VSSI before VSSI went out of business. Although VSSI complains of a list of other conduct

allegedly committed by Honeywell, the only evidence of any unlawful agreement is the Northeast Products scheme with Lavanture, which resulted in lower prices to Lavanture. On January 1, 1995 Lavanture entered into an "Independent Contractor Agreement" with Northeast Products. However, prior to the execution of the agreement Lavanture made its first payment to Northeast Products, which coincides with the first shipment of parts to Lavanture at a reduced price. The lower prices charged to Lavanture continued through the time the agreement was executed.[5]

■■■ To prove an agreement exists between two or more persons, a plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). It is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an express agreement. Most conspiracies are inferred from the behavior of the alleged conspirators. *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir.1989). To make out a conspiracy, and thus survive a motion for summary judgment, the circumstantial evidence must reasonably "tend to exclude the possibility" that the alleged conspirators acted independently. *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Here, although the evidence is thin that Lavan-

ture and Honeywell conspired to steal VSSI's business through lower prices, no pro-competitive explanation has been provided by Honeywell for the Northeast Products agreement. In conjunction with the circumstantial evidence that payments to Northeast Products coincided with lower prices to Lavanture, there is a sufficient factual issue to survive summary judgment on the issue of whether a conspiracy existed between Lavanture and VSSI.

Having determined that there is some evidence of an agreement, the Court must next determine whether the agreement constitutes "an unreasonable restraint of trade." In making this determination the Court must consider whether the alleged agreement is governed by the per se violation rules or the rule of reason analysis.

■■■ In vertical restraint cases, such as the instant case, the rule of reason analysis applies. *See, Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988)(the presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies).[6] To sustain a claim under the rule of reason, the Plaintiff must show: (1) that the defendant's conduct has an anti-competitive effect in the relevant market; and (2) that there is no pro-competitive justification for the conduct. *Levine v. Cent. Florida Medical Affiliates*, 72 F.3d 1538, 1551 (11th Cir.1996). In order to satisfy these criteria the Plaintiff must first define and prove

---

**5.** The only other evidence of an agreement is exhibit 34. This document is a single page of a "memo to R.A. Lavanture" which makes statements such as "should increase VSSI prices and decrease [Lavanture] now! (Volume, disruption war)" and [why it is] "so hard to say that LPC is the only distributor." In a separate order the Court has determined the document is not admissible because the document is hearsay and there are no excep-

tions to the admissibility of the document that apply.

**6.** Per se illegality has been limited to four categories of restraints: (1)horizontal and vertical price fixing; (2) horizontal market divisions; (3) group boycotts or concerted refusals to deal; and (4) tying arrangements. *See, Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 n. 33 (11th Cir.1991). None of these are alleged in the instant case.

a relevant market, which consists of both relevant product and geographic markets. *All Care Nursing Services, Inc. v. High Tech Staffing Services, Inc.*, 135 F.3d 740, 749 (11th Cir.1998).[7]

### 1. *The Relevant Market*

The parties have offered varying definitions of the relevant market. Initially, VSSI asserted that the relevant market is "the sale of safety restraints to the van conversion industry." (Doc. 137, at 43). On the other hand, Honeywell contends that the relevant market is "the sale of safety restraints in the world" or all seat belt systems. (Doc. 99, at 39). According to Honeywell, there is no basis for dividing the market into one segment for Original Equipment Manufacturers ("OEMs") and another for van converters because there is ample substitutability between products sold to OEMs and those sold to van converters.

The characterization of the relevant market does not end here. Plaintiff's expert, Dr. Henry Fishkind, testified at deposition that the relevant market consisted of the people who *manufacture* safety restraint systems for the van conversion industry. (Doc. 69, Tab 1,Fishkind Dep. at 14, 34 and 91.) On September 6, 2000 at the *Daubert* hearing VSSI appeared to assert that the relevant market was the *distribution* market for the sale of safety restraint systems to the van conversion industry. (Doc. 177, at 53). Lastly, in post hearing briefing VSSI asserts that its market definition has not changed and that both VSSI and Dr. Fishkind have consistently contended that the relevant market is the sale of safety restraints to the van conversion industry in the United States. (Doc. 179 at 1). While there is clearly some confusion on the part of the Plaintiff, the conflicting approaches to the "market" are more relevant to the analysis of the issue of "market power" in the relevant market, rather than being determinative of the threshold issue of identifying the relevant market.[8] Accordingly, the Court will analyze the definition of relevant market based on Plaintiff's theory that the relevant product market is the sale of safety restraints to the van conversion industry as compared to Honeywell's theory that the relevant product market is the sale of all seat belts, and not just seat belts sold to the van conversion industry.

The basic rule that governs market definition was characterized by the Supreme Court as follows:

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purpose make up that

7. Defining a relevant market is also essential to establishing a § 2 Sherman Act claim. The criteria for establishing a relevant market under § 1 and § 2 of the Sherman Act are essentially the same.

8. Honeywell argues at length that Dr. Fishkind should not be allowed to change his position in order to avoid summary judgment. (Doc. 178 at 2.) Although there is a lack of clarity on this issue in Dr. Fishkind's testimony, at deposition and at the *Daubert* hearing, his expert report does affirmatively define the relevant market as "safety restraint systems for the van conversion industry in the U.S."

(Doc.129, Ex. A at 2.) While the conflicting answers given by Dr. Fishkind regarding the market may be fertile ground for cross-examination at trial, the testimony does not rise to the level of the type of direct contradiction, which courts have held cannot be used to defeat a motion for summary judgment. *See, Van T. Junkins & Assoc., Inc., v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir.1984). Accordingly, the court concludes that definition of market in the report submitted by Dr. Fishkind can be used by VSSI in opposing Honeywell's motion for summary judgment.

'part of the trade or commerce', monopolization of which may be illegal.

*United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1956). Although the contours of a particular market will inevitably vary, "[t]he tests remain constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." 351 U.S. at 404, 76 S.Ct. at 1012. The reasonable interchangeability of use or the cross-elasticity of demand between a product and its substitutes constitutes the outer boundaries of a product market for antitrust purposes. *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.*, 7 F.3d 986, 995 (11th Cir.1993)( citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510).

■ The gist of the dispute concerning the definition of the relevant market is whether there is product substitutability between seat belts bought by the van conversion industry and seat belts bought by the automobile industry. VSSI argues that there is a great degree of difference between seat belts used in the van conversion industry and seat belts used by OEMs. In support of this argument VSSI points to the fact that modifications to seat belts manufactured for OEMs can cost as much as $500,000 per vehicle type in order to convert an OEM belt to a belt suitable for the van conversion industry. (Doc. 69, Tab 2, Ford Decl.) In addition, VSSI stresses that because the van conversion industry is a small market consisting of only about $15 million in annual sales, it does not make economic sense for a company to design belts solely for use by the van conversion industry in view of the approximate $10 million cost to design and tool seat belts. (Doc. 69, Tab 2, Ford Decl.)

Honeywell, on the other hand, asserts that · "there is perfect substitutability of both demand and supply" between products sold to OEMs and those sold to van converters. (Doc. 99, at 39) On the issue of substitutability the Court concludes that VSSI has established sufficient evidence of record to create material issues of fact.

For example, the testimony of various participants in the industry suggest that seat belts sold to the van conversion industry and those sold to OEMs might not be interchangeable. Robin Whyte, AlliedSignal's Director of Marketing testified that the two seat belts were "quite different" in production and that "[T]hey just couldn't be ... they could not be interchanged." (Doc. 130, Whyte Dep. at 114–116.) Further, Wayne Cooper, LaVanture's Vice-President of Distribution, testified that van conversion seat belts are different and could not be sold to the automobile manufacturers. (Doc. 75, Cooper Dep. at 85–87, 105–107.)

■ In addition to evidence of the lack of substitutability there are other factors the Court may view in order to determine the relevant market. In *U.S. Anchor v. Rule Industries*, 7 F.3d 986 (11th Cir. 1993), the Eleventh Circuit noted that because "[i]t is ordinarily quite difficult to measure cross-elasticities of supply and demand accurately" it is "usually necessary to consider other factors that can serve as useful surrogates for cross-elasticity data ..." *Id.* at 994 These other factors may include: (1) whether the products and services have sufficiently distinctive uses and characteristics; (2) whether industry firms routinely monitor each other's actions and calculate and adjust their own prices on the basis of other firm's prices; (3) the extent to which consumers consider various categories of sellers as substitutes; and (4) whether a sizeable price disparity between different types of

sellers persists over time for equivalent amounts of comparable goods and services. *Id.*

On several of these surrogate factors there is evidence to support VSSI's market definition. Notably, the van conversion industry recognizes itself as a separate market. Both Plaintiff's and Defendant's experts have referred to data specifically collected for the van conversion industry by the Recreation Vehicle Industry Association (Doc. 83, Price Dep. at 15.) In addition to industry groups AlliedSignal, itself, recognized the van conversion industry as separate from the OEM market in its own market analysis. (Doc. 135, Ex. 7.) Lastly, Honeywell's expert economist concedes that seat belts sold to the van conversion industry are marketed at different prices from those sold to OEMs and that the van conversion belts are marketed, sold and distributed through different distribution channels from the seat belts sold to OEMs. ( Lewis Dep. at 106–114.)

VSSI's expert, Dr. Fishkind, additionally opined that AlliedSignal earned extraordinary profits on sales to the van conversion industry compared to AlliedSignal's profits earned on OEM sales. (Doc. 69, Fishkind Dep. at 94.) As a general proposition this testimony would tend to support the surrogate factor of the disparity between price. However, Honeywell has attacked this testimony on a number of grounds as being legally insufficient.

As an initial argument Honeywell asserts that "rate of return" is not an accepted measure of monopoly power citing *Blue Cross & Blue Shield United v. Marshfield Clinic,* 65 F.3d 1406, 1411–12 (7th Cir.1995)(Posner, J.)("not only do measured rates of return reflect accounting conventions more than they do real profits or losses as an economist would understand those terms, but there is not even a good economic theory that associates mo-

nopoly power with a high rate of return.") While Honeywell is correct that a high rate of return standing alone is not determinative of market power, the comparison of "profits" earned by one manufacturer on two separate products it sells is evidence of price disparity, one of the surrogate factors that a court can examine in determining the relevant market.

Additionally, Honeywell challenges Fishkind's reliance on "rate of return" arguing that his conclusion is not supported by the record. Honeywell's expert opines that because of the smaller sales volume of seat belts sold to van converters, there would be a higher fixed cost per unit for items such as arranging deliveries, monitoring inventories, collections and the capital costs of setting up a production line. From this premise Honeywell argues that the fixed costs for producing the seat belts for van converters should be higher. Honeywell goes on to surmise that the "profit" referred to by Dr. Fishkind is really the margin on variable costs. Therefore, as Honeywell interprets Dr. Fishkind's opinion, the conclusion that higher rates of return have been earned may be flawed. Although this analysis is not an unreasonable interpretation of the evidence, it is, nonetheless, merely Honeywell's interpretation of the opinion of VSSI's expert.

VSSI vigorously disagrees with Honeywell's interpretation and argues that Dr. Fishkind compared variable profit margins of OEM sales to van conversion sales from Honeywell's own documents and, thus, the conclusions are relevant to defining why the two products—OEM seat belts and van conversion seat belts—operate in separate markets. While the parties both offer differing explanations of the interpretation of the data it cannot be said that the explanation of Dr. Fishkind should be ignored for summary judgment purposes.

All of this underscores the fact that on the issue of defining the relevant market there are material issues of fact in dispute.

While none of these factors is determinative on its own, these factors in conjunction with the disputed evidence on the issue of interchangeability, counsel against the entry of summary judgment on the issue of defining the relevant market. Accordingly, the Court concludes that there are genuine issues of material fact regarding the issue of defining the relevant market and, therefore, summary judgment on this issue must be denied. *See, U.S. Anchor,* 7 F.3d 986, 994 (the definition of a relevant market is "essentially a factual question."); *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1573 (11th Cir.1991)("The parameters of a given market are a question of fact and therefore summary judgment is inappropriate if there are material differences of fact").[9]

### 2. Market Power

In a § 1 Sherman Act vertical restraint case once the relevant market has been defined the Court must then identify both the interbrand and intrabrand markets in order to determine whether the supplier has sufficient power to restrain trade in the interbrand market and whether there is a diminution or elimination of competition in the intrabrand market. *See, Graphic Products Distributors, Inc., v. ITEK Corp.,* 717 F.2d 1560, 1571–73 (11th Cir.1983). This process involves an analysis of the defendant's market power in the relevant market. Market power is the ability to raise price significantly above the competitive level without losing all of one's business. *Graphic Products,* 717 F.2d at 1570. Because of the difficulty of measuring market power market share is often used as a guidepost. This is so because "[m]arket share directly relates to the effectiveness of interbrand competition in minimizing the anticompetitive effects of a restraint on intrabrand[10] competition." *Graphic Products* at 1570.

Honeywell's market share of the van conversion seat belt market was approximately 92% in 1993 and was approximately 70% in the year 2000. This Circuit has held that market shares of between 60% to 65% suffice to raise a jury question on the issue of market power. *McGahee v. Northern Propane Gas Co.,* 858 F.2d 1487, 1506, (11th Cir.1988); *see also, Eastman Kodak Co. v. Image Technical Serv., Inc.,* 504 U.S. 451, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992)( 80–95% of market is a monopoly); *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)( 87% of the market is a monopoly).

Honeywell argues that even though it held a large market share, statements by various industry participants evidence that there were ample alternative sources of supply, thus demonstrating that Honeywell did not have market power. (Doc. 99, at 42.) These statements include comments

---

**9.** Regarding the issue of the relevant geographic market there is no serious dispute as to this issue in view of the fact that AlliedSignal only sold seat belts to van conversion businesses within the United States and Lavanture and VSSI similarly only sold seat belts to van conversion businesses in the United States.

**10.** Generally, interbrand competition is defined as competition among suppliers or manufacturers of the same generic product, while intrabrand competition is the competition between distributors of the product of a particular supplier or manufacturer. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977). Here, interbrand competition would include competition between Honeywell and other manufacturers, such as TRW or Autoliv. Intrabrand competition would involve competition between VSSI and Lavanture.

made by VSSI in a market analysis such as "supplier concentration is not considered a concern," and there are "other seat belt suppliers" from which "seat belts could be purchased." Although this evidence may be the subject of cross-examination at trial, it does not establish, as a matter of law, that VSSI did not have market power. Accordingly, on the issue of market power there is at least a genuine material issue of fact that precludes entry of summary judgment on this issue.

### 3. *Anticompetitive Effect*

In addition to satisfying the criteria discussed above, VSSI must show an anticompetitive effect either in the intrabrand or interbrand markets. *Graphic Distributors* at 1571. On this issue the parties offer conflicting views of the law and of the record evidence.

Honeywell characterizes VSSI's claim as one involving only harm to intrabrand competition. (Doc. 178, at 5.) A cursory examination of VSSI's claim would support this characterization. The essence of VSSI's claim is that by virtue of its elimination from the intrabrand or distribution market, intrabrand competition has been harmed because the distribution market now largely consists of Lavanture, and in the absence of VSSI, there is insufficient competition to exert downward pressure on Honeywell's prices in the distribution market. Honeywell's view of the law is that if VSSI can only show harm to intrabrand competition that showing is insufficient to establish harm to competition under § 1 of the Sherman Act.

As expected, VSSI offers a different view of its claim and the law. In addition to the effect on intrabrand competition, VSSI alleges there is harm to the interbrand market as well. In VSSI's view when the large customer base was transferred from VSSI to Lavanture entry into the interbrand market became less attractive. According to VSSI, this is particularly applicable here because of the relatively small size of the van conversion seat belt market. VSSI asserts that had Honeywell simply terminated VSSI "then it would have been logical for other manufacturers to either employ VSSI as a distributor or to directly enter the market to compete against AlliedSignal." VSSI also argues that even if it has not shown harm to interbrand competition, in the Eleventh Circuit harm to intrabrand competition alone is sufficient.

■ ] Although the Court is of the view that VSSI's theory of harm to interbrand competition is fanciful and ignores basic economic principles the Court need not decide this issue because as the law now stands in the Eleventh Circuit a claimant in a § 1 Sherman Act case does not need to show that the restraint has had an actual anti-competitive effect on interbrand competition and may establish a claim by showing the reduction or elimination of intrabrand competition. *Graphic Products*, 717 F.2d at 1572 n. 20; *Storer Cable Communications, Inc., v. City of Montgomery, Alabama*, 826 F.Supp. 1338 (M.D.Ala.1993) While there is reliable authority to the contrary, *see, e.g. Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F.Supp. 760, 768 (S.D.Miss.1992), *aff'd*, 986 F.2d 1418 (5th Cir.1993)(a complainant "must allege anti-competitive effect at the interbrand level of competition" to establish § 1 Sherman Act violation.), the Court is bound to follow the view of the Eleventh Circuit.

Under the Eleventh Circuit's analysis in *Graphic Products* the interbrand market is relevant in order to determine whether competition at the interbrand level adequately checks the exploitation of intrabrand market power. The reason the

Court's inquiry must focus on this issue is because:

> A seller with considerable market power in the interbrand market ...will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold. Dealers by competing against each other and bidding the retail price down, will in turn exert downward pressure on the seller's wholesale price in order to maintain their profit margins. Thus, in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price.... [v]ertical restraints in this context may enable a manufacturer to retain monopoly profits arising from an interbrand competitive advantage.

717 F.2d at 1572 n. 20 (J. Tjoflat).

In the instant case, VSSI alleges that the restraint of trade (i.e. the agreement between Lavanture and Northeast Products) caused the elimination of competition in the distribution market so that after VSSI was eliminated there was an adverse effect on competition in the distribution market and a corresponding reduction in the downward pressure placed on both the retail and wholesale prices of van conversion seat belts.

Although this economic theory would appear to be at odds with the dealer termination cases—which uniformly hold that termination of a dealer does not violate the Sherman Act, even if the termination is the result of an agreement with a prospective new dealer, *see, e.g. Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir.1978); *Golden Gate Acceptance Corp. v. General Motors Corp.*, 597 F.2d 676 (9th Cir.1979)—those cases are distinguishable. The distinguishing feature between the dealer termination cases and the *Graphic Products* case appears to be that in the dealer termination cases the only conduct alleged to be a violation is the termination itself. This case on the other hand is alleged to involve more than a simple dealer termination.[11] Here, the record discloses facts that, if believed by a jury, suggest that the termination was the result of an agreement between Honeywell and Lavanture to transfer the customers of VSSI to LaVanture and not just an agreement to terminate VSSI.

Accordingly, because VSSI claims that there was harm to intrabrand competition as a result of the alleged illegal agreement, and the level of interbrand competition is insufficient to check the exploitation of intrabrand competition, under *Graphic Products,* Honeywell is not entitled to summary judgment even though VSSI has failed to prove harm to interbrand competition.

## B. *Section Two Of The Sherman Act*

VSSI claims that Honeywell violated § 2 of the Sherman Act, 15 U.S.C. § 2, based upon theories of monopolization, attempted monopolization and conspiracy to monopolize.[12]

---

**11.** Indeed, VSSI tacitly concedes that it might not have a viable § 1 Sherman claim if Honeywell had simply terminated it rather than attempting to transfer VSSI's customers to LaVanture, as VSSI alleges.

**12.** VSSI also claims that Honeywell violated the Florida Antitrust Act, Fla. Stat. § 542.19.

Florida courts have held that the Florida legislature has effectively adopted the body of antitrust law developed by the federal courts under the Sherman Act. *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So.2d 1028 (Fla.Dist.Ct.App.1984). Therefore, the analysis under § 2 of the Sherman

### 1. *Monopolization Claim*

In order to establish a claim for monopolization under § 2 of the Sherman Act VSSI must establish: (1) the possession of monopoly power [13] in the relevant market and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business, acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1705, 16 L.Ed.2d 778 (1966).

The relevant market is defined by VSSI to be the sale of seat belts sold to the van conversion industry in the United States. (*See, infra* pp. 1302–05.) Accepting this definition of the market for purpose of the summary judgment motion, the record discloses that Honeywell had 92% of the market in 1993 and now has approximately 70% of the market. VSSI asserts that these market shares would be sufficient to establish monopoly power in the interbrand market and, therefore, would be sufficient to satisfy the first prong of a § 2 monopolization claim. *See, Eastman Kodak,* ( 80–95% of market is a monopoly). The determination of monopoly power under a § 2 Sherman claim is, however, more involved than simply determining market share. Monopoly power is "the power to raise prices to supra-competitive levels or . . . the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *Levine v. Central Florida Medical Affiliates, Inc.,* 72 F.3d 1538, 1555 (11th Cir. 1996) (citations omitted).

Although "[a] high market share . . . may ordinarily raise an inference of monopoly power, [it] will not do so in a market with low entry barriers or other evidence of a defendant's ability to control prices or exclude competitors." *See, e.g. Oahu Gas Serv., Inc. v. Pacific Resources, Inc.,* 838 F.2d 360, 366 (9th Cir.), *cert denied,* 488 U.S. 870, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988). Thus, where entry barriers are low, market share does not accurately reflect the party's market power. *United States v. Waste Management, Inc.,* 743 F.2d 976, 982–83 (2d Cir.1984).

Barriers to entry may be defined as either "additional long-run costs that were not incurred by new entrants," or "factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *See,* Areeda & Hovenkamp, *Antitrust Law* ¶ 409 at 509–10 (1992). The disadvantage of new entrants as compared to incumbents is the hallmark of an entry barrier. *See,* Areeda, *id.* ¶ 409e at 303. However, "[t]he mere fact that entry requires a large absolute expenditure of funds does not constitute a 'barrier to entry'; a new entrant is disadvantaged only to the extent that he must pay more to attract those funds than would an established firm." *Id.*

The main sources of entry barriers are: (1) legal license; (2) control over an essential or superior resource; (3) entrenched buyer preferences for established brands or company reputations; and (4) capital market evaluations imposing higher capital costs on new entrants. *Los Angeles Land Co. v. Brunswick Corporation,* 6 F.3d 1422, 1428 n. 4 (9th Cir.1993)[citing Areeda & Turner, *Antitrust Law* ¶ 409b at 299–300 (1978) ].

---

Act applies equally as well to the Florida state law antitrust claims and need not be discussed separately.

**13.** Monopoly power under § 2 requires something greater than market power under § 1. *Eastman Kodak,* 504 U.S. at 480, 112 S.Ct. at 2090.

VSSI contends there are barriers to entry because the tooling cost per part for producing conversion seat belts can be as high as $500,000. This is particularly so, according to VSSI, because the market is relatively small. While these tooling costs may be somewhat of a disincentive for firms to enter the market they are not such to permit Honeywell to raise prices to supra-competitive levels. Assuming Honeywell was to do so, other than the original tooling cost of $500,000, there is nothing else to prevent a new entrant from entering the market and selling its products at prices below the supra-competitive prices, thus, allowing the new entrant to quickly gain market share. Indeed, the record supports this conclusion. It is undisputed that after VSSI exited the market Honeywell's market share fell from 93% to approximately 70%. New entrants were able to come into the market after VSSI's exit and this occurred even though Honeywell has not raised its prices since VSSI's exit.

VSSI has failed to show any other barrier to the entry of another manufacturer into the market and, accordingly, has failed to establish monopoly power by Honeywell. Further, to the extent that VSSI claims Honeywell monopolized the distribution market for van conversion seat belts—a position taken by VSSI during oral argument—there is absolutely no evidence in the record that there are any barriers to entry at the distribution level.

Moreover, to the extent VSSI claims that Honeywell has monopolized the distribution market, its claim must also fail because Honeywell does not compete at the distribution level but only competes at the manufacturing level. Where a defendant does not compete in a particular market it cannot be guilty of monopolization or attempted monopolization of a market in which it does not compete. *See, Aquatherm Industries, Inc. v. Florida Power & Light Company,* 145 F.3d 1258, 1261 (11th Cir.1998)(monopolization claim dismissed where no allegations that defendant increased its market share or erected barrier of entry into market in which it did not compete).

VSSI's reliance on *Ad–Vantage Te. Dir. Consult. v. GTE Directories,* 849 F.2d 1336 (11th Cir.1987), to support its argument that a monopolization claim can be asserted against a manufacturer for monopolizing the distribution market, is misplaced. *Ad–Vantage* involved a manufacturer who was also a distributor and thus vertically integrated. In contrast, Honeywell was at all times strictly a manufacturer who sold its products through distributors such as VSSI and Lavanture and, thus, was not vertically integrated. Accordingly, VSSI cannot claim, as matter of law, that Honeywell monopolized the distribution market for van conversion belts because VSSI cannot prove that Honeywell competed in that segment of the market or created barriers to the entry of new participants in that segment of the market. For these reasons, Honeywell's motion for summary judgment as to VSSI's monopolization claim is due to be granted.[14]

### 2. *Attempt To Monopolize*

VSSI also asserts a claim for attempted monopolization. In order to es-

---

**14.** The second prong of a § 2 claim is the use of monopoly power to "foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 2090. VSSI argues that its monopolization claim should be viewed as an unlawful maintenance of a monopoly rather than the unlawful acquisition of a monopoly. However, as previously dis-

cussed, Honeywell's market share fell from 93% to 70%. Accordingly, even assuming VSSI's theory is based on the maintenance of a monopoly the same reasoning supporting the Court's conclusion that VSSI has failed to establish monopoly power applies to a claim based on maintenance of monopoly power.

tablish a violation of § 2 for attempted monopolization, "a plaintiff must show (1) an intent to bring about a monopoly and (2) a dangerous probability of success." *Norton Tire Co. v. Tire Kingdom Co.*, 858 F.2d 1533, 1535 (11th Cir.1988). To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power. *American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1581 (11th Cir.1985). As discussed *infra* at pp. 1308–09, VSSI has failed to establish that Honeywell had monopoly power (as distinguished from market power) and, accordingly for the reasons that VSSI's monopolization claim must fail, its attempt to monopolize claim is subject to the same fate.

### 3. *Conspiracy To Monopolize*

 VSSI's also claims that Honeywell conspired to monopolize the van conversion market. A plaintiff proves a § 2 Sherman conspiracy to monopolize claim by showing: "(1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy." *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1460 n. 5 (11th Cir.1991). A claim for conspiracy to monopolize does not require a showing of monopoly power. *Levine*, 72 F.3d at 1555.

As a threshold matter, a section 1 claim and a section 2 conspiracy to monopolize claim both require the existence of an agreement. *See*, R. Posner, *Antitrust Law: An Economic Perspective* 216 (1976)("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade, which violates section 1"). As discussed *infra*. pp. 1300–01, there is a material issue of fact as to whether there was an agreement between Honeywell and LaVanture to restrain trade, or

for purposes of § 2, an agreement to monopolize.

 After this showing is made the plaintiff must prove that the conspiracy was formed with the specific intent to obtain or maintain a monopoly. While the evidence is thin regarding whether there was intent to monopolize, the Court concludes that there is an issue of fact concerning the intent aspect of the conspiracy claim under § 2. The circumstances surrounding the formation of the agreement between Honeywell's executives, through Northeast Products, and LaVanture, are hotly in dispute. As to whether the intent of this agreement was to obtain a monopoly is an issue to be resolved by the fact finder at trial and not this court on summary judgment. Accordingly, Honeywell's motion for summary judgment as to VSSI's conspiracy to monopolize claim must be denied.

### C. *Antitrust Standing*

Honeywell argues that all of the antitrust claims should be dismissed for lack of antitrust standing. According to Honeywell, the harm to competition, alleged by VSSI, is that suffered by the van converters and the customers of the van converters, the van buyers. The alleged harm to this segment of the market consists of allegedly higher prices and reduced service.

 Standing in an antitrust case involves more than the "case or controversy" requirement that drives constitutional standing. *Todorov*, 921 F.2d at 1448. The Eleventh Circuit follows a two pronged approach in deciding whether a plaintiff has antitrust standing. *Municipal Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1499 (11th Cir.1991). Under this approach a plaintiff must show: (1) the plaintiff suffered antitrust injury;

and (2) that it is a proper antitrust plaintiff, i.e. an efficient enforcer of the antitrust laws. *Todorov*, 921 F.2d at 1449. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). The determination of the second prong—i.e. whether plaintiff is an efficient enforcer of the antitrust laws—is predicated on the "target area test." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1388 (11th Cir.1990). Under the target area test the plaintiff must basically show that it is a customer or competitor in the relevant antitrust market. *Florida Seed Company, Inc. v. Monsanto Company*, 105 F.3d 1372, 1374 (11th Cir.1997)(*citing Associated General Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983)). Plaintiff has satisfied both prongs of the standing analysis.

Concerning antitrust injury, under VSSI's theory, it was directly effected by the alleged agreement to restrain trade between Honeywell (through the sham Northeast Products) and Lavanture. According to VSSI the alleged illegal agreement permitted Honeywell to facilitate the transfer of VSSI's customers to Lavanture by means of alleged lower prices to Lavanture.

] This situation is in contrast to the situation in *G.K.A. Bev. Corp. v. Honick-*

*man*, 55 F.3d 762 (2nd Cir.1995), favorably cited by Honeywell. In *G.K.A.* a group of soft drink distributors brought an action against, Seven–Up, a soft drink concentrate manufacturer, alleging violations of the antitrust laws for forcing out of business the bottler with whom the distributors had contracts. The Court upheld the dismissal of the complaint because the antitrust harm was directed to the bottler and not the independent distributors, who were only effected by virtue of the fact that they did business with the bottler. That situation is in stark contrast to the instant case where the allegations are that the actions of Honeywell were aimed directly at VSSI. Accordingly, assuming VSSI can prove its claims it has alleged sufficient antitrust injury to satisfy the first prong of the antitrust standing test.

The second prong of the test is also satisfied. Because VSSI is both a customer in the market i.e. a customer of Honeywell and a competitor of LaVanture, the alleged co-conspirator in the alleged illegal agreement, VSSI can be considered a target against which the anti-competitive activity was directed. As such, the allegations establish the necessary facts to satisfy the target area test. For these reasons the Court concludes that VSSI has established antitrust standing.[15]

### D. *Vicarious Liability of Honeywell*

Honeywell correctly contends that VSSI's claim under § 1 of the Sherman Act, its claim for conspiracy to monopolize under § 2 and its Robinson Patman claim

---

**15.** Honeywell has argued at length that VSSI's claim is nothing more than a claim by a disappointed distributor, who has been terminated. Relying upon this characterization Honeywell argues that a terminated distributor does not have antitrust standing because the antitrust laws protect competition and not competitors. The Court agrees that a disappointed distributor does not have an antitrust claim nor antitrust standing to complain when it is terminated. However, VSSI bases its antitrust claim on the alleged illegal agreement with Lavanture and not solely on the fact that it was terminated. Had VSSI only complained about the termination of its distributorship the Court agrees that the antitrust claims should be dismissed.

are based on the lower prices given to LaVanture by Honeywell, which lower prices were the result of bribes, as VSSI alleges, or extortion committed by Honeywell employees, as Honeywell contends. Honeywell argues from this proposition that it cannot be held liable under agency principles for criminal acts that were committed while its employees were acting adversely to the corporation.

VSSI responds that summary judgement is not warranted for several reasons. First, VSSI contends that there are material issues of fact concerning whether the scheme was a bribery scheme or an attempt to extort payments from VSSI. Within this context VSSI argues that there are issues of fact concerning whether the actions of Zimmerman and the Rumanciks were within the course and scope of their employment with Honeywell and secondly, whether the acts were committed to serve the interests of Honeywell or were committed only to serve the interests of the employees.

 Agency law principles adopted by Florida courts are fairly uniform in holding that an employer is not liable for torts committed by its employees where the employee has acted outside the scope of his employment or has committed the tort to further some purpose of his own. However, where the tort is committed at least partly to serve the employer or is committed within the scope of his employment the employer can be held liable. *See, Quick v. Peoples Bank of Cullman County,* 993 F.2d 793, 797 (11th Cir.1993); *Blount v. Sterling Healthcare Group, Inc.,* 934 F.Supp. 1365, 1372 (S.D.Fla.1996)(*and cases collected therein* ); *Tallahassee Furniture Co. v. Harrison,* 583 So.2d 744, 758–759 (Fla.Dist.Ct.App.1991). This is so even if the alleged wrong was a crime, was not authorized by the employer, or was

forbidden by the employer. *Blount* at 1372.

 Further, within these broad agency principles there is also the principle of apparent agency. Apparent agency arises where the principal causes others to believe that an individual has authority to conduct the act in question. *See, Madio Group, Inc. v. Shores,* 897 F.Supp. 1408, 1411 (M.D.Fla.1995) Under apparent authority principals may be liable even if the principal derives no benefit from the agent's actions and even if the agent acts entirely for his own purposes. *U.S. v. One Parcel of Real Estate,* 852 F.Supp. 1013, 1039 (S.D.Fla.1994).

These same agency principles have been applied as well by federal courts in the antitrust context. *See, e.g. American Society of Mechanical Engineers, Inc. v. Hydrolevel Corporation,* 456 U.S. 556, 565–566, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Union City Barge Line, Inc. v. Union Carbide Corp.,* 823 F.2d 129 (5th Cir.1987).

 Applying these principles to the instant case leads the Court to conclude that there are genuine issues of material fact concerning whether Honeywell may be held liable for the actions of its employees. The record regarding each aspect of the agency analysis is sharply in dispute. Honeywell, on the one hand, contends that because the actions of Zimmerman and the Rumnaciks were crimes, their actions cannot be considered within the scope of their employment. However, it is undisputed that Zimmerman and the Rumanciks were high level employees of Honeywell who dealt with VSSI and Lavanture with the authority to act on behalf of Honeywell. Whether Zimmerman and the Rumanciks had apparent authority to enter into the Northeast Products contracts must be resolved by the trier of the fact and not by this court on a motion for summary judgment.

Additionally, there is a sharp factual dispute concerning whether the actions of Honeywell's employees were solely for their benefit and were, at least in part, for the benefit of Honeywell. Honeywell contends that because lower prices were given as a result of the Northeast Products schemes it lost revenue and, therefore, the actions could not be for its benefit. While this may be true, VSSI argues that the actions of the employees were to further the business interests of Honeywell by facilitating the transfer of VSSI's customers to Lavanture. Arguably, if this was the goal of the arrangement, Honeywell would have benefitted and, thus, could be liable if it is determined that the scheme was extortionate. Accordingly, because there is conflicting evidence and testimony regarding whether the actions of Zimmerman and the Rumanciks were within the scope of their employment with Honeywell and there remain sharply disputed accounts of whether the lower prices caused Honeywell to lose money or facilitated its efforts to obtain VSSI's customers, Honeywell's motion for summary judgment on this issue must be denied.

### E. *In Pari Delicto*

Honeywell also requests summary judgment in its favor concerning all of the antitrust claims against it based on the doctrine of *in pari delicto*.[16] According to Honeywell it has a complete defense to the antitrust claims because VSSI was a complete participant in the unlawful scheme that allegedly caused the antitrust injury. In support of its *in pari delicto* defense Honeywell contends that "VSSI was an initiator of, and full participant in, the Northeast Products scheme." Further, Honeywell asserts that VSSI was more at fault than Honeywell because "VSSI acted with actual knowledge of the unlawful nature of its conduct [while] Honeywell ... was kept in the dark..." Lastly, Honeywell argues that allowing the *in pari delicto* defense in this case "does nothing to hinder enforcement of the antitrust laws by private attorneys general." (Doc. 99, at 34.)

VSSI argues that *in pari delicto* is not a recognized defense in the Eleventh Circuit, or alternatively, even if it is a recognized defense, it does not apply under the facts in this case. Lastly, VSSI contends that at a minimum if the defense is recognized there are material issues of fact, which preclude summary judgment.

In the antitrust arena, the leading case discussing the applicability of the *in pari delicto* defense is *Perma Life Mufflers, Inc. v. Intern. Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). In *Perma Life* a divided Supreme Court held that the *in pari delicto* defense was not applicable to the facts of that case, because applying the defense would interfere with the antitrust policy of the government. 392 U.S. at 138–39, 88 S.Ct. at 1984. However, five justices in concurring opinions expressed a view that some aspect of the *in pari delicto* defense is viable under the antitrust laws. *Id.* at 146, 88 S.Ct. 1981 (White, J. concurring), 147 (Fortas, J., concurring), 149 (Marshall, J. concurring), and 153 (Harlan and Stewart, JJ., concurring in part and dissenting in part). Several courts after *Perma Life* have applied a limited application of the defense in the antitrust context. *See, General Leaseways, Inc. v. National Truck Leasing Association, et al.,* 830 F.2d 716, 724 (7th Cir.1987)( doctrine applies if it "bore substantially equal responsibility for the anti-

---

**16.** The phrase *"in pari delicto"* is a Latin phrase which literally translated means "of

equal fault."

competitive restrictions."); *THI–Hawaii, Inc. v. First Commerce Financial Corporation*, 627 F.2d 991 (9th Cir.1980)("complete involvement" of plaintiff in illegal scheme barred recovery); *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 16 (4th Cir.1971); *see also*, American Bar Association, *Antitrust Law Developments* at 820 ("most courts have followed the view expressed in the separate opinions in *Perma Life* in fashioning a limited *in pari delicto* defense").

The Eleventh Circuit in *Tidmore Oil Co., Inc. v. BP Oil Co.*, 932 F.2d 1384, 1388 (11th Cir.1991), without discussion, and citing *Perma Life*, noted that "the Supreme Court has rejected the application of the doctrine of in pari delicto in antitrust actions" and therefore observed in dicta that "an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement." Subsequently, the Eleventh Circuit in *Banco Industrial De Venezuela, C.A. v. Credit Suisse*, 99 F.3d 1045 (11th Cir.1996) had occasion to address the *in pari delicto* defense, albeit in a securities fraud case and not an antitrust case. In *Banco Industrial* the court affirmed the district court's denial of a motion for new trial, based in part, on the challenge that the defendant should not have been permitted to assert the equitable defense of *in pari delicto* as a bar to plaintiff's action at law. In discussing the test to be applied the court defined the test as follows: "[U]nless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the in pari delicto defense should not be allowed, and the plaintiff should be compensated." *Id.* at 1049 [*citing Pinter v. Dahl*, 486 U.S. 622, 636 108 S.Ct. 2063, 2073, 100 L.Ed.2d 658 (1988)]

██ The Court is of the considered view that the combined teachings of these decisions from the Eleventh Circuit, as well as the decisions from other jurisdic-

tions, post *Perma Life*, evidence that the *in pari delicto* defense is available as a defense in an antitrust action, although the application of the defense is to be made on a case by case basis and is limited to the situation where the plaintiff's responsibility is "essentially indistinguishable" from or "clearly greater" than the responsibility of the defendant. It does not, however, bar an antitrust claim where there is merely some culpability on the part of the plaintiff. This view is consistent with the holding in *Perma Life* and not inconsistent with the Eleventh Circuit decisions that have dealt with the issue, thus far.

██ Having determined that the defense, in a limited form, is available the Court must then examine whether the defense on these particular facts is applicable. Honeywell's argument hinges on its characterization of the scheme as a bribery scheme initiated by Mr. Arnold and conducted over a period of three years allegedly without the knowledge of Honeywell. The record on this issue, however, is sharply in dispute. Mr. Arnold testified that he was extorted and forced to make the payments to the Honeywell employees in order to continue to do business with Honeywell. (Doc. 138, Tab 27, ¶ 6.) Further, there are reasonable inferences that may be drawn that someone at Honeywell should have known of the scheme by virtue of the fact that VSSI, and then subsequently Lavanture, were given lower prices and favorable credit terms. Additionally, there was a great disparity in the relative bargaining positions of VSSI as compared to Honeywell, a large "Fortune 500" corporation, which is a factor that may be used in determining whether the defense applies. *See, Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.*, 604 F.2d 897, 902 (5th Cir.1979)

In sum, after a thorough review of the record the Court is firmly convinced that

there are significant disputes of material fact, and inferences from facts of record, concerning the issue of whether VSSI was at fault, and if so, the degree of its fault, as compared to Honeywell, all of which mandate that Honeywell's motion for summary judgment on the *in pari delicto* defense be denied.

### F. *Illegality of Contract*

 Honeywell challenges the contract claim asserted by VSSI on the theory that the contract is unenforceable because it is the result of illegal acts. Count IV of the Second Amended Complaint alleges that a December 23, 1993 memorandum purportedly initialed by a Honeywell employee grants VSSI exclusive rights as a distributor of certain products. According to VSSI Honeywell breached this agreement by allowing Lavanture to purchase these exclusive products without allowing VSSI to charge a mark up in price as required by the agreement.

Relying on *Phillips Chemical Company v. Morgan,* 440 So.2d 1292 (Fla.Dist.Ct. App.1983), Honeywell contends that because illegal payments were made to Zimmerman to execute the document, the contract was so permeated with fraud and illegality as to bar recovery. As framed by Honeywell, its argument does not depend upon whether the payments were bribes or payments made as a result of an extortionate scheme engineered by Honeywell employees. However, Honeywell's argument assumes that the December 23, 1993 contract was the result of the Northeast Products payment scheme.

A review of the record discloses there are vastly differing interpretations of the

reason for the December 23, 1993 agreement. VSSI points to evidence that the contract was simply an agreement that memorialized long standing Honeywell policy that products developed for a customer may only be sold to the customer. Further, there is an issue of whether the "bribery in June 1992" could have been for the purpose of obtaining a contract in December, 1993, some nineteen months later. Moreover, there are issues of fact as to whether Honeywell was made aware of the existence of the contract and ratified it by not objecting.

While *Phillips Chemical Company* does support the argument that agreements consummated as the result of the payment of kick-backs may not be enforced by the courts, the factual record in the instant case does not establish that the December 23, 1993 letter agreement was executed as a direct result of the illegal payments. Accordingly, because there are material issues of fact in dispute it is the province of the jury to determine this issue and not for the Court to make this determination on summary judgment.[17]

## IV. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that: (1) Honeywell's Motion For Summary Judgment as to Counts I, II, IV, V, VII be **DENIED;** (2) Honeywell's Motion For Summary Judgment as to the claims for monopolization and attempted monopolization under § 2 of the Sherman Act, asserted in Count III be **GRANTED;** (3) Honeywell's Motion For Summary Judgment as to the claims for monopolization and attempted monopolization under Florida law asserted

---

**17.** Honeywell also argues that for the same reasons any claims for "implied" contract are unenforceable. (Doc.99, at 37). Although Honeywell does not reference count VII of the Second Amended Complaint, to the extent Honeywell has requested summary judgment as to Count VII the motion is denied for the same reasons that apply to the express contract claim.

in Count VI be **GRANTED;** and (4) Honeywell's Motion For Summary Judgment as to the claims for conspiracy to monopolize asserted in Count III under § 2 of the Sherman Act and asserted in Count VI under Florida law be **DENIED.**

January 17, 2001.