**SPANISH BROADCASTING SYSTEM, INC. Plaintiff,**

v.

**CLEAR CHANNEL COMMUNICATIONS, INC. and HISPANIC BROADCASTING CORPORATION. Defendants.**

No. 02–21755.

United States District Court, S.D. Florida.

Jan. 31, 2003.

Stephen N. Zack, Antonia Carmelo Castro, Boies Schiller & Flexner, Miami, FL, David Boies, Robert J. Dwyer, Boies Schiller & Flexner, Armonk, Mark Jurgen Heise, Boies Schiller & Flexner, LLP, Miami, FL, Sigrid Stone McCawley, Boies Schiller & Flexner, Hollywood, FL, for Plaintiff.

Michael Nachwalter, Brian F. Spector, Lauren Carol Ravkind, Kenny Nachwalter Seymour Arnold Critchlow & Spector, Miami, FL, Stephan D. Susman, Charles R. Eskridge, III, Erica W. Harris, Susman Godfrey, Houston, TX, Robert C. Josefsberg, Podhurst Orseck Josefsberg et al., Miami, FL, G. Irvin Terrell, Samuel W. Cooper, Rebeca Aizpuru, Baker Botts L.L.P., Houston, TX, Larry D. Carlson, Baker Botts, Dallas, TX, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS WITH PREJUDICE

SEITZ, District Judge.

THIS CAUSE is before the Court on the Motions of Defendant Clear Channel Communications, Inc. and Defendant Hispanic Broadcasting Corporation to Dismiss Plaintiff's Amended Complaint. [D.E. 23, 24]. Having considered the motions, the consolidated response, the replies, and af-

ter extensive oral argument,[1] the Court grants both motions with prejudice.

Defendant Clear Channel Communications, Inc. ("CC"), cannot be liable for a Sherman Act Section Two ("Section Two") monopolization, attempted monopolization, or conspiracy to monopolize violation or a violation of Sherman Act Section One ("Section One") because it is a non-competitor in the "relevant market."[2] Although Defendant Hispanic Broadcasting Corporation, ("HBC"), is a competitor in the Plaintiff's definition of the relevant market, the Plaintiff fails to assert facts indicating injury to competition in general, and merely alleges injury to a specific competitor, itself. Such a defect is fatal to the Section One and Section Two claims against the Defendants. Because the Court has federal jurisdiction over this case only under the Sherman Act, the Court declines to exercise its supplemental jurisdiction over the remaining myriad of state law claims.

## Background

Plaintiff, Spanish Broadcasting System, Inc. ("SBS"), is a Spanish-language radio company which owns fourteen stations in seven U.S. markets. Defendant, HBC,[3] operates fifty-five Spanish-language radio stations in the United States in fourteen different markets. Defendant, CC, is the largest English-language radio company in the country with 1,200 stations in over 300 markets. SBS and HBC are direct competitors in five of the top-ten U.S. markets for Spanish-language radio[4] and both companies have expanded rapidly in the past few years-paralleling the swift growth of the country's Hispanic population.[5] *See Am. Compl.* ¶ 12. At oral argument, SBS sup-

---

1. At the January 9, 2003 oral argument, the Plaintiff had an extensive opportunity to bring forth any facts which would buttress its federal antitrust claims. The Seventh Circuit has questioned whether a district court should " 'flesh out' " an antitrust complaint, and has noted that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984).

However, the Court allowed SBS to rectify orally the facial deficiencies in its Amended Complaint because at this procedural stage, the Court must draw all reasonable inferences in the Plaintiff's favor and consider, in the interests of justice and efficiency, the Plaintiff's best arguments. Moreover, the Eleventh Circuit has even permitted district courts to consider claims first raised at a motion to dismiss hearing so long as the court also considers the factual allegations offered orally to support that claim. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1195(11th Cir.2002); *see also Crowe v. Coleman*, 113 F.3d 1536, 1541 n. 4 (11th Cir. 1997) ("when motions are orally argued [even when the pertinent hearing is for argument only and not one for the presentation of evidence], important things sometimes happen which impact on the factual record-for example, the judge while interrogating the lawyers obtains stipulations, concessions, and so on.").

2. For purposes of the motion to dismiss, CC did not contest the Plaintiff's definition of the relevant market: the top-ten Spanish-language radio listening markets.

3. HBC resulted from the 1997 merger of Clear Channel-owned Heftel Broadcasting Corporation and Tichenor Media Systems, Inc. CC owned 63% of Heftel Broadcasting before the merger, and after the merger, CC owned 26% of the new company, HBC.

4. These ten largest markets in descending size order are: Los Angeles, Miami, New York, Houston, Chicago, San Francisco, San Antonio, Dallas, Brownsville and Phoenix. SBS competes with HBC in Los Angeles, Miami, New York, Chicago, and San Antonio.

5. Hispanics are the fastest growing U.S. minority group. The Hispanic population increased 58% during the 1990s from 22.4 million in 1990 to 35.3 million in 2000; His-

plemented its Amended Complaint by adding that the relevant product was the sale of advertising allocated to Spanish-language radio in those ten markets.[6] In support of their definition of the relevant market, the Plaintiff pointed to the fact that advertisers and advertising companies have set aside separate budgets for Spanish-language radio and English-language radio. *Oral Argument* p. 12, line 7–12. In addition, Spanish-language radio advertising is distinct from other media advertising such as Spanish-language television and print advertising because the advertisers designate a specific budget amount for Spanish-language radio. *Oral Argument* p. 12, line 13–21.

The essence of SBS's claims is that after SBS refused CC's 1996 acquisition offer, HBC and CC engaged in anticompetitive conduct which "prevent[ed] SBS from competing on a level playing field with HBC ...." *Am. Compl.* ¶ 16. SBS contends that CC and/or HBC sought to frustrate SBS's plans to expand its operations[7] and limited SBS's ability to compete in the top-ten Spanish-language markets. Allegedly, CC and/or HBC: (1) hindered SBS's ability to raise capital;[8] (2) attempted to depress SBS's stock price;[9] (3) in June 2002,

---

panics are the largest racial minority at 12.5% of the total U.S. population. *See* Robert Suro, *Latino Growth in Metropolitan America: Changing Patterns, New Locations*, Center on Urban & Metropolitan Policy and the Pew Hispanic Center (July 2002) at *www.pewhispanic.org/index.jsp* (last visited January 29, 2003). By 2020 the Hispanic population will double its 1995 size to 53 million and triple its 1995 size in 2040 to 80 million, and reach nearly 97 million in 2050. Jennifer Cheeseman Day, *Population Projections of the United States by Age, Sex, and Hispanic Origin: 1995 to 2050*, U.S. Bureau of the Census, Current Population Reports 15–17 (1996).

**6.** *See* Transcript of *Spanish Broadcasting System, Inc. v. Clear Channel Communications, Corp. et. al.*, Hearing on Motions to Dismiss, 02–21755–CIV–SEITZ (January 9, 2003) (hereinafter "Oral Argument") at p. 8, line 15–17 ("[a]nd what we are talking about in terms of a product here is the sale of advertising by radio stations in each of those [ten] markets. We are not talking about the sale of radio stations ...").

**7.** To operate a radio station in the United States, a company must first obtain one of the limited number of licenses from the Federal Communications Commission ("FCC"). The FCC granted these licenses long ago, and they are infrequently sold. A radio company seeking to enter a market or expand its current market presence ordinarily must raise capital to acquire existing stations. *Am. Compl.* ¶ 13.

**8.** SBS alleges three particular actions. First, in December 1996, CC induced SBS's long-time sales representative, Katz Hispanic Media, to breach its contract with SBS and to become HBC's national sales representative. Second, in May 1999, SBS selected Lehman Brothers ("Lehman") as sole lead manager and selected Merrill Lynch and BT Alex Brown ("BTAB") and CIBC to be the co-managers of SBS's Initial Public Offering ("IPO"). Randall Mays (CC's Executive Vice-President and CFO) told Lehman's Managing Director that Raul Alarcon, Jr. (SBS's CEO) was a "drug user and/or drug trafficker" and thus not to proceed with the IPO. *Am. Compl.* ¶ 21(b). The IPO proceeded nonetheless. Third, after BTAB was selected as a co-manager, CC called BTAB and stated that if BTAB participated in SBS's IPO, CC would take its business ($30 million in annual fees) elsewhere. Thus, BTAB was forced to withdraw from the underwriting syndicate.

**9.** According to the Plaintiff, CC and HBC took steps to depress SBS's stock price by seeking to limit or eliminate coverage of SBS by leading securities analysts, specifically: (a) CC pressured a leading BTAB analyst not to cover SBS; (b) CC and HBC orchestrated the departure of a leading Lehman radio analyst who had prepared to cover SBS stock; and (c) HBC threatened to deny normal analyst access to another Lehman radio analyst if he continued to cover SBS.

HBC also attempted to get SBS's shareholders to sell their shares and thus depress SBS's stock price. HBC leaked confidential

forced HBC to be acquired by Univision rather than continue merger talks with SBS; (4) wrongfully prevented SBS from acquiring radio stations and bid up the prices of other stations; [10] (5) induced SBS employees to breach their contracts and work for HBC; (6) vandalized property at SBS stations; and (7) interfered with SBS's relationships with its advertisers.[11] Moreover, the Plaintiff asserts that CC effectively controls HBC because CC owns 26% of HBC's stock and has veto power over critical HBC activities.[12]

The catalyst for this lawsuit began on March 25, 2000 when SBS proposed that HBC and SBS merge and integrate the "leading companies in the operation of Spanish-language radio stations" in the top-ten Spanish markets. *Am. Compl.* ¶ 11. Negotiations continued through May of 2002 and SBS thought it would make a presentation to HBC's Board of Directors in early June, 2002. *Oral Argument* at p. 38, line 20–25 thru p. 39 line 1–7. However, on June 12, 2002, HBC announced it intended to merge with Univision, a major

Spanish-language television company, instead of with SBS. On the same day, the Plaintiff filed an eleven-count complaint against Defendants, for violation of Sections One and Two of the Sherman Act, for violations of the Florida Antitrust Act, the California Unfair Competition Act and Cartwright Act, and for tortious interference with business relationships, defamation, injurious falsehood, trade libel, and breach of confidentiality.[13] Plaintiff alleges CC interfered with the Plaintiff's negotiations with HBC because CC wanted Univision to acquire HBC.

CC's motion to dismiss argues that SBS fails to state a claim under the Sherman Act because: (1) CC is not a competitor with SBS in the relevant market and CC does not effectively control HBC, and (2) while SBS alleges an economic injury to itself, it does not allege an anti-competitive effect to the relevant market. HBC argues that SBS: (1) fails to state a claim under Section One because it fails to plead the existence of a relevant market and harm to competition, and (2) fails to state a

acquisition discussions between SBS and HBC and made disparaging remarks about SBS's future to SBS's leading institutional investors such as Putnam Investment Management and Janus Capital, Inc. *Am. Compl.* ¶ 22(c)(i)-(ii).

10. For example, SBS alleges that CC wrongfully appropriated a business opportunity SBS proposed to Golden West Broadcasters, operators of a Los Angeles radio station (KSCA–FM) in 1996. *Am. Compl.* ¶ 23(a). CC purchased the option on KSCA–FM and then assigned it to HBC in Feb. of 1997. SBS alleges that CC or HBC interfered with SBS's acquisition of other radio stations by driving up the prices SBS paid for those stations. *See Am. Compl.* ¶ 23(b)-(c).

11. SBS contends that HBC pressured Cardenas–Fernandez Associates (which is 50% owned by CC) to discontinue advertising on SBS stations. *Am. Compl.* at ¶ 20.

12. CC has veto power over any HBC plan to: sell or transfer substantially all of its assets; issue any shares of preferred stock; amend HBC's certificate of incorporation to adversely affect the shareholder rights of CC's class of stock; declare or pay any non-cash dividends or any non-cash distribution; and amend the articles of incorporation concerning HBC's capital stock. CC also appoints two of HBC's five-member Board of Directors. *Am. Compl.* ¶ 26.

13. SBS withdrew its Tenth Cause of Action for Trade Libel. *Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss Plaintiff's Amended Complaint,* ("Pl's Opp.") (filed Oct. 16, 2002) at 30.

claim under Section Two because it does not identify the facts indicating there is a dangerous probability that HBC could monopolize the relevant market.

For the purposes of this motion, the Court has accepted the Plaintiff's definition of the relevant market and HBC's alleged market share of that relevant market. However, the Court finds that SBS, as a matter of law, has not and cannot allege that HBC's and CC's actions have injured competition in general. This omission is fatal to both Plaintiff's Sherman One and Sherman Two claims against both Defendants. In addition, CC as a non-competitor in the relevant market cannot, as a matter of law, be liable under Section One or Two.

### Discussion

To survive a Rule 12(b)(6) motion to dismiss, a complaint need only provide a short and plain statement of the claim and the grounds on which it rests. *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A Rule 12(b)(6) motion tests not whether the plaintiff will prevail on the merits, but instead, whether the plaintiff has properly stated a claim for which relief can be granted. *See* Fed. R.Civ.P. 12(b)(6); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Thus, a court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In deciding such a motion, the court must accept all the complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683. Moreover, the threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *Ancata v. Prison Health Svcs., Inc.*, 769 F.2d 700, 703 (11th Cir.1985) (citation omitted). In an antitrust action, "[a] plaintiff must plead sufficient facts so that each element of the alleged antitrust violation can be identified." *Mun. Util. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1501 (11th Cir.1991). In short, the complaint must allege enough facts, rather than conclusions, to show there is a legal claim for which relief can be granted.

### I. Sherman Act Section One

Section One of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . ." and penalizes "every person who shall make any contract or engage in any combination or conspiracy . . . declared to be illegal." 15 U.S.C. § 1 (West 2002). Under Section One, a plaintiff must show that the defendant: (1) entered into a contract, combination or conspiracy which was (2) in restraint of trade or commerce, and (3) that it was damaged by the violation. *Moecker v. Honeywell Int'l, Inc.*, 144 F.Supp.2d 1291, 1300 (M.D.Fla.2001).

■ An alleged Section One violation which does not fall within the category of *per se* antitrust violations is analyzed under the "rule of reason." [14] *Id.* at 1301–02. The "rule of reason" looks beyond the

---

**14.** The four categories of restraints subject to *per se* treatment are: (1) horizontal and vertical price fixing; (2) horizontal market divisions; (3) group boycotts or concerted refusals to deal; and (4) tying arrangements. *Moecker,* 144 F.Supp.2d at 1302. SBS does not allege that the Defendants engaged in any of these activities.

structure of the agreement and requires a plaintiff to show that: "(1) a relevant market existed that was affected by the challenged restraint; (2) the defendant possessed 'market power' within the relevant market; (3) there was an anticompetitive effect in the intrabrand or interbrand market; and (4) the negative effects on competition are not outweighed by the positive effects on competition." *Godix Equip. Exp. Corp. v. Caterpillar, Inc.*, 948 F.Supp. 1570, 1579 (S.D.Fla.1996).

### A. *Hispanic Broadcasting Corporation*

The Court will assume, as SBS alleges, that the Defendants agreed to frustrate SBS's efforts to expand its operations and limit SBS's ability to compete. However, even assuming that such an agreement existed, to prevail on its antitrust claims SBS must show a relevant market affected by the challenged restraint, the Defendants' market power in that relevant market, and the anticompetitive effect on competition in general. The Court will examine each of these critical elements.

#### 1. *Relevant Market*

■ A relevant market consists of a geographic and a product component. *Godix*, 948 F.Supp. at 1579. The relevant market is defined geographically as " 'the area of effective competition.' " *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 423 (11th Cir.1984) *citing Brown Shoe Co. v. United States*, 370 U.S.

294, 324, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The relevant product market consists of: " 'products that have reasonable interchangeability for the purposes for which they are produced-price, use and qualities considered.' " *Moecker*, 144 F.Supp.2d at 1302.[15] A relevant market "is a market composed of products which compete with each other; that is, products that are reasonably interchangeable from a buyer's point of view." *Godix Equip.*, 948 F.Supp. at 1580–81 (finding relevant market to be a market for both "will fit" and genuine Caterpillar replacement parts). The question of a relevant market is a factual one. *See, e.g., Covad Communications Co. v. BellSouth Corp.*, 299 F.3d 1272, 1279 (11th Cir.2002) (noting that antitrust cases are fact-intensive inquiries); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 & 996 (11th Cir.1993) (holding that the relevant market consisted of light weight generic and economy fluke anchors and a reasonable juror could not find that the market also included branded higher quality boat anchors); *Godix Equip.*, 948 F.Supp. at 1580 ("The composition of the relevant product market is a question of fact usually resolved by the jury.").

The Second and Third Circuits require federal antitrust plaintiffs to allege sufficient facts to show that an alleged product market bears a "rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-

---

**15.** Other factors include: "(1) whether the products and services have sufficiently distinctive uses and characteristics; (2) whether industry firms routinely monitor each other's actions and calculate and adjust their own prices on the basis of other firm's prices; (3) the extent to which consumers consider various categories of sellers as substitutes; and (4) whether a sizeable price disparity between different types of sellers persists over time for equivalent amounts of comparable goods and services." *Moecker*, 144 F.Supp.2d at 1303–04.

elasticity of demand [16] . . . ." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir.2001); *see Queen City Pizza, Inc. v. Domino's Pizza,* 124 F.3d 430, 436 ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitutes . . . the relevant market is legally insufficient and a motion to dismiss may be granted."); *see also, B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 172 (S.D.N.Y.1995) (finding that chest equalization radiography [the Plaintiff's defined relevant market] was not an independent product market but part of overall X-ray market). In *Queen City Pizza*, the Third Circuit found that the plaintiff defined its proposed relevant market too narrowly because the Domino's approved supplies and ingredients (which the franchisee must purchase from Domino-approved vendors) were fully interchangeable with other pizza supplies outside the relevant market. *See Queen City Pizza*, 124 F.3d at 441.

The parties have not cited any Eleventh Circuit decisions addressing whether plaintiffs must plead facts regarding the level of product interchangeability of use or cross-elasticity of demand. Courts in this District, however, have not required plaintiffs to allege such important facts at the complaint stage. *See Aventura Cable Corp. v. Rifkin/Narragansett S. Fla. CATV Ltd. P'ship*, 941 F.Supp. 1189, 1193 (S.D.Fla. 1996) (stating that "determining [the] 'reasonable interchangeability of use . . . between a product and its substitutes constitutes the outer boundaries of a product

market' " is a factual question and "best left for a later stage of the proceedings."); *see also, In re America Online, Inc.*, 168 F.Supp.2d 1359, 1375–76 (S.D.Fla.2001) (dismissing complaint for failing to allege relevant geographic and product market, not for failing to allege interchangeability). Furthermore, in defining the relevant market, courts in this District have found it sufficient if the plaintiff provides facts demonstrating a distinct market. *Gen. Cigar Holdings v. Altadis, S.A.*, 205 F.Supp.2d 1335, 1349–50 (S.D.Fla.2002). The *General Cigar* court found that the plaintiff defined a relevant market consisting of "cigars and non-Cuban premium cigars" because they sufficiently distinguished cigars from other tobacco products. *Id.* ("[c]igars are distinguished from other tobacco products based on their distinctive tastes, aromas, size, shape, and other characteristics" and "non-Cuban premium cigars have 'tastes, aromas, histories, reputations and other characteristics that differ from Cuban premium cigars.' ").

■ At oral argument, SBS stated that the relevant product was the advertising allocated to Spanish-language radio in the top ten markets. The Plaintiff contends that Spanish-language radio is distinct because advertisers and advertising companies have set aside separate budgets for Spanish-language radio and English-language radio. *Oral Argument* p. 12, line 7–12. The Spanish-language advertising budget is distinct from other media budgets such as Spanish-language television and print advertising because advertisers designate a specific amount and budget for Spanish-language radio. *Oral Argument* p. 12, line 13–21. Given these allegations

16. "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to an-

other product." *Todd*, 275 F.3d at 201–02 (citation omitted).

and the favorable deference the Court must give to the Plaintiff's factual allegations and the minimal pleading requirements, the Plaintiff has defined a relevant product and geographic market. SBS has also alleged facts to show that Spanish-language radio advertising is not interchangeable with English-language radio advertising or other Spanish-language media advertising such as in television and newspapers. While SBS has distinguished its defined relevant market from other language radio markets, SBS has not alleged any facts that show HBC advertising time is interchangeable with that of SBS. However, for the purposes of this motion, the Court assumes that they are interchangeable. Thus, the Court accepts that SBS has pled the relevant product and geographic market and now turns to the remaining elements under Section One: market power and anticompetitive effect.

#### 2. *Market Power*

■ The Eleventh Circuit has defined market power narrowly as: " 'the ability to raise price significantly above the competitive level without losing all of one's business.' " *See Graphic Prods. Distrib. v. Itek Corp.*, 717 F.2d 1560, 1570 (11th Cir. 1983). Market share may be an alternative to analyzing market power to determine the potential for genuine adverse effects on competition because market power is often difficult to define and requires complex econometric analysis. *See id.;*

see also, *Retina Assocs. P.A. v. S. Baptist Hosp.*, 105 F.3d 1376, 1382 (11th Cir.1997) (finding that Defendants' control of fifteen percent of general ophthalmologists referrals to retina specialists in Jacksonville area was insufficient to constitute market power). "Market share directly relates to the effectiveness of interbrand competition [17] in minimizing the anticompetitive effects of a restraint on intrabrand competition." *Moecker,* 144 F.Supp.2d at 1305 (citation omitted).

SBS alleged at oral argument that HBC held 51% of the ad revenues for Spanish-language radio in the top-ten markets. *Oral Argument* at 20, line 11–20. Moreover, SBS alleges that with HBC's market share, HBC can control prices and keep competition out. *Id.* at 35, line 5–11. Therefore, for the purposes of this motion as to HBC, the Court accepts that SBS has sufficiently alleged that HBC has market power.[18]

#### 3. *Anticompetitive Effect*

■ To prove an anticompetitive effect the Plaintiff must show "an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition ....' " *Levine,* 72 F.3d at 1551 (citations omitted). In short, the plaintiff must show that the defendant's action harmed the consumer. "Even an act of pure malice by one business competitor against another does not,

---

**17.** "Interbrand competition is defined as competition among suppliers or manufacturers of the same generic product, while intrabrand competition is the competition between distributors of the product of a particular supplier or manufacturer." *Moecker,* 144 F.Supp.2d at 1305.

**18.** The *U.S. Anchor* court noted that the quantity of actual goods or services sold to

consumers, as compared to revenues, is the appropriate determinant of market power; "actual unit sales must be used whenever a price spread between various products would make the revenue figure an inaccurate estimator of units sales." 7 F.3d at 999. At this procedural stage, the Plaintiff's measure of market share is assumed to be correct.

without more, state a claim under the federal antitrust laws ...." *Brooke Group Ltd. v. Brown & Williamson Tobacco Co.*, 509 U.S. 209, 225, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). "The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

Thus, even unfair means to substitute "one competitor for another without more does not violate the antitrust laws." *L.A. Draper*, 735 F.2d at 421 (citations omitted); *see also, Weight–Rite Golf Corp. v. U.S. Golf Ass'n*, 766 F.Supp. 1104, 1111 (M.D.Fla.1991) (noting that USGA's ability to decrease the marketability of a manufacturer's golf shoes by amending its rules of play did not constitute violation of the rule of reason). "This [injury to competition] requirement ensures that otherwise routine business disputes between business competitors do not escalate to the status of an antitrust action." *Tops Mar-* *kets Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 96 (2d Cir.1998) (citation omitted).

SBS alleges injury to itself such as the depression of its stock price, paying more for stations than it might have had to, and the misappropriation of business opportunities, but it has not alleged actual or potential detrimental effect on competition.[19] The Court has extensively culled through the allegations in both the Amended Complaint and Plaintiff's oral argument. While SBS alleges numerous examples of injury to itself, it does not allege-beyond its one conclusionary statement- " the person hurt is the advertiser who has less opportunity to reach an audience, has to pay a higher price, those kind of things"-how the advertiser has or will be injured. *See Oral Argument* at 51, line 8-10. In fact, SBS contends that CC and HBC allegedly used their market power to keep advertising rates down in the Spanish-language market so that CC could benefit by keeping English rates up. *See Oral Argument*, p. 35, line 5-11. How the advertiser in the top-ten Spanish language radio markets is injured by radio stations keeping advertising rates low is not clear. Moreover, even SBS's claim that it was

---

**19.** HBC cites *Caribbean Broadcasting System., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080 (D.C.Cir.1998), as an example of where a court found that a plaintiff had given sufficient notice of injury to the relevant market to survive a motion to dismiss on its Sherman Act claim. There, however, the plaintiff alleged facts that the defendant's conduct injured the consumer in the relevant market and that U.S. customers in the relevant market suffered antitrust injury. 148 F.3d at 1086–87. Nowhere in the Amended Complaint or during oral argument does SBS argue facts, rather than present a conclusionary statement on this element. Moreover, SBS cites *Full Draw Productions v. Easton Sports, Inc.*, 182 F.3d 745, 754 (10th Cir.1999), for the proposition that "eliminating or diminishing a competitor's ability to vie for business is precisely the type of injury that the antitrust laws were intended to protect against." *Pl's Opp.*, at 15. However, in *Full Draw*, the Tenth Circuit noted that the plaintiff in that case had alleged that the elimination of the plaintiff as a competitor would "directly and substantially reduc[e] 'output' of exhibitor space and directly and substantially reduc[e] the ability of the consumers of such space to purchase exhibitor space." 182 F.3d at 753–54. Plaintiff's complaint continued: "because FDP [an archery show promoter] produced one of only two archery business trade shows in the United States, the purposeful and wrongful destruction of FDP's business by Defendants directly *injured competition as well as injuring FDP*." *Id.* at 754 (emphasis added).

injured is suspect because SBS states that it has "expanded rapidly in the past few years." *Am. Compl.* ¶ 12.

Finally, it is puzzling how the alleged actions of CC and HBC in the 1990s, in federal antitrust terms, have injured or have the potential to genuinely and adversely injure the advertisers in the Plaintiff's defined market. As recently as the Spring of 2002, the Plaintiff proposed the merger of the "two leading companies [HBC and SBS] in the operation of Spanish-language radio stations." *Am. Compl.,* ¶ 11. It is curious that Plaintiff saw no federal anticompetitive problem there, yet it complains the actions of HBC and CC would injure the advertiser in the relevant market. *Oral Argument,* pps. 24 line 19–25 thru p. 25 line 1–13. The Plaintiff has not and apparently cannot allege facts showing general anticompetitive effects to support its Section One claim against the Defendants.

### B. Clear Channel as Non–Competitor in Relevant Market

■ CC also argues that it is free from Sherman Act liability because it is a non-competitor in the relevant market. A non-competitor in the relevant market normally cannot be liable for a Section One violation. *See United States v. MMR Corp.,* 907 F.2d 489, 498 (5th Cir.1990); *United States v. Sargent Elec. Co.,* 785 F.2d 1123, 1127 (3d Cir.1986) (concluding that "an agreement among persons who are not actual or potential competitors in the relevant market is for Sherman Act purposes *brutum fulmen*."); *United States v. Reicher,* 777 F.Supp. 901, 904 (D.N.M.1991)

(finding that defendant's agreement to have a non-competitor submit sham bid for laboratory project did not violate Section One because sham bidder was not a current or potential competitor in relevant market). A non-competitor violates Section One if it enters a conspiracy *already existing between two or more competitors.*[20] *See MMR Corp.,* 907 F.2d at 498 (emphasis added) ("a noncompetitor can join a Sherman Act bid-rigging conspiracy among competitors."); *see also, Smithkline Beecham Corp. v. E. Applicators, Inc.,* 2002 WL 1197763, *7 (E.D.Pa. May 24, 2002) (concluding that non-competitor defendant who entered an already existing conspiracy to fix bids could be liable for a Section One violation).

In fact, SBS does not contend that CC and SBS compete in the proposed relevant market. CC does not even own any radio stations in the Plaintiff's relevant market. Thus, as a non-competitor who has no present potential to compete with SBS, CC cannot, as a matter of law, conspire with HBC to violate Section One. Nor, under the facts Plaintiff alleges, does CC further an already existing conspiracy between two competitors. Therefore, for this additional reason, SBS also fails to state a Sherman Act One claim against CC.

### II. Sherman Act Section Two

■ The Sherman Antitrust Act makes it is a crime for any "person [to] monopolize, or attempt to monopolize, or combine with any other person or persons, to monopolize any part of the trade or commerce among the Several States . . . ." 15 U.S.C. § 2 (West 2002) ("Section Two"). To pre-

---

**20.** The Plaintiff has not alleged that there was an already existing agreement between two or more competitors in the relevant market. Since there is no legal basis for CC's liability under Section One, it follows that there can be no conspiracy liability against HBC. HBC cannot conspire with itself.

vail on a Section Two claim, the Plaintiff must establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power...." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In the Eleventh Circuit, "to have a dangerous probability of successfully monopolizing a market, the defendant must be close to achieving monopoly power." *U.S. Anchor,* 7 F.3d at 994. Courts look at the relevant market under consideration and the defendant's power within that relevant market in determining whether there is a dangerous probability of monopolization. *Id.*

### A. *Hispanic Broadcasting Corporation*

The Court must conduct an analysis of SBS's Section Two claims similar to its analysis of SBS's Section One claims. Having accepted for the purposes of this motion the Plaintiff's definition of the relevant market, *see infra* pp. 7–10, the Court considers the allegations of the Defendants' possession of or dangerous probability of possessing monopoly power and the effect to competition in general.

### 1. *Monopoly Power*

Although monopoly power under Section Two is similar to market power under Section One, it requires something greater than market power. *Moecker,* 144 F.Supp.2d at 1308, n. 13 (citation omitted). Monopoly power involves "the power to raise prices to supra-competitive levels ... or the power to exclude competition in the relevant market either by restricting entry of new competitors or by driving existing competitors out of the market." *See U.S.*

*Anchor,* at 994. As with Section One market power, market share is a revealing guidepost in determining whether there is a dangerous probability of monopolization. *See U.S. Anchor,* at 999 ("the primary measure of the probability of acquiring monopoly power is the defendant's proximity to acquiring a monopoly share of the market.").

"A dangerous probability of achieving monopoly power may be established by a 50% share ...." *Id.* When the plaintiff pleads less than a majority share of the relevant market, the plaintiff must show additional factors such as: the defendant's share compared to its competitors, "the strength and capacity of current competitors, the potential for entry, the historic intensity of competition; and the impact of the legal or natural environment." *General Cigar,* 205 F.Supp.2d at 1350–51 (concluding that defendant's 39% share of relevant market without more could not, as a matter of law, constitute dangerous probability of monopolization of relevant market).

SBS's Amended Complaint alleges nothing about market share. Only at oral argument did the Plaintiff contend that HBC held 51% of the advertising revenues in the top-ten markets for Spanish-language radio. However, considering the low-threshold of the Plaintiff's pleading burden and the fact that SBS has alleged that HBC holds a majority share of the relevant market, for the purposes of HBC's motion, the Court accepts that SBS has sufficiently asserted facts indicating a dangerous probability of HBC monopolizing the relevant market.

### 2. *Injury to Competition*

■ However, even if the plaintiff can allege a dangerous probability of monopol-

izing the relevant market, it must also show harm to competition under Section Two. *See American Key Corp. v. Cole Nat. Corp.,* 762 F.2d 1569, 1579 n. 8 (11th Cir. 1985) (citation omitted). As described above,[21] SBS's omission of any facts alleging injury to competition in the relevant market is likewise fatal to its Section Two claim. Plaintiff is represented by respected and knowledgeable counsel in these proceedings. Notwithstanding the Plaintiff's two attempts at formal pleading and the Court's specific request to address this issue at oral argument, the Plaintiff has not provided any facts to allege this element. At this point, the Court must conclude there are none. Plaintiff's failure necessitates dismissal of its Sherman Act claims against both Defendants.

### B. *Clear Channel as Non–Competitor in Relevant Market*

■ A Section Two claim against a non-competitor also is not viable against a non-competitor in the relevant market. *See Aquatherm v. Florida Power & Light,* 145 F.3d 1258, 1261 (11th Cir.1998) (affirming district court's dismissal of Section Two claim because electric power company did not compete in the relevant market—pool heaters); *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.,* 849 F.2d 1336, 1348 (11th Cir.1987) (concluding defendant did not compete in the same market-the sale of national advertising); *Moecker,* 144 F.Supp.2d at 1309 (finding manufacturer of conversion van seat belts did not compete with a distributor of seatbelts in the distribution market).

As noted above, SBS does not allege nor can it allege that CC competes in the Plaintiff's proposed relevant market of advertising in the top-ten Spanish-language radio markets. Seeking to circumvent this legal impediment to its Section Two claim, SBS contends that CC effectively controls HBC and thus can attempt to monopolize the relevant market-i.e., HBC is really CC's stealth vehicle to monopolize the market. Thus, SBS alleges that CC owns 26% of HBC and appoints two members of HBC's five-person board of directors.[22] However, before one corporate entity can be held liable for the alleged federal antitrust wrongs of another corporate entity, the plaintiff must satisfy the state law standard for piercing the corporate veil. *See United Nat'l Records v. MCA, Inc.,* 616 F.Supp. 1429, 1432 (N.D.Ill.1985) (holding that corporate parent could not be held liable for antitrust violations of its subsidiary because both companies maintained separate corporate identities). Under Florida law, a court can pierce the corporate veil when there is "a showing that a corporation was formed, or at least employed, for an unlawful or improper purpose-as a subterfuge to mislead or defraud creditors, to hide assets, to evade the requirements of a statute or some analogous betrayal of trust …." *Lipsig v. Ramlawi,* 760 So.2d 170, 187 (2000). SBS has not alleged that HBC was a sham or mere instrumentality for CC to engage in illegal or improper activities. In fact, at oral argument, SBS did not dispute CC and HBC's representations that the FCC *requires* that CC play a passive role in the operations of HBC, and CC has an agreement that it will not have any control over HBC. *Oral Argument* p. 60, line 17–20.

Furthermore, the Eleventh Circuit has said that contract power under an exclu-

---

**21.** *See infra* p. 1359–1361.

**22.** *See supra* p. 1355 n. 12 (describing CC's

decision-making authority over HBC policy).

sive dealing arrangement is distinguishable from market power. *See Maris Distr. Co. v. Anheuser–Busch Inc.*, 302 F.3d 1207, 1224 (11th Cir.2002) (holding that beer manufacturer's restriction on distributors from being owned in whole or in part by the public was a valid exercise of contract power and not violation of Sherman Act). Similarly, any purported "control" that CC has over HBC is an exercise of a valid contract agreement between the parties, and under these facts, not a violation of the Sherman Act. Therefore, the conclusionary allegation of "control" is insufficient to state a Section Two claim against CC for attempted monopolization. The immutable fact is that CC is a non-competitor in Plaintiff's defined relevant market, and SBS cannot avoid that fact's legal effect.

In its response, Plaintiff asks that if the Court dismisses its Section Two claims against CC, it be allowed to amend its Amended Complaint to add a claim of conspiracy to monopolize against CC. However, the Eleventh Circuit in *Aquatherm* stated that "[e]qually fatal to Aquatherm's conspiracy allegation is the fact that no authority exists holding a defendant can conspire to monopolize a market in which it does not compete." 145 F.3d at 1262 n. 4. Thus, leave to amend to add a conspiracy to monopolize claim against CC would be futile and therefore is denied.

Although not explicitly referenced in its Section Two cause of action, the Plaintiff articulated a monopoly leveraging claim at oral argument. *See, e.g., Oral Argument*, pps. 27–28 (arguing that CC, through its alleged monopoly of major concert venues, leverages its power to prevent performers from appearing on SBS stations). The Eleventh Circuit does not recognize a monopoly leveraging claim against a party

who is a non-competitor. *Aquatherm*, 145 F.3d at 1262.

## III. *Dismissal with Prejudice*

Having considered the parties' papers and extensive oral argument, the Court must dismiss this action with prejudice. Although the Eleventh Circuit has stated recently that "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases," *Covad*, 299 F.3d at 1279, the facts of this case warrant dismissal with prejudice. Unlike *Covad* where the defendant telephone company denied a high-speed internet digital subscriber line company an essential facility to function, this case is really about the fallout from a failed merger. SBS expected to merge with HBC and create the largest Spanish-language radio station in the top-ten markets, but HBC decided to accept Univision's offer instead. On the same day as the merger was announced, SBS sued CC and HBC for alleged predatory conduct which is purported to have started approximately six years ago.

SBS argues that its deal with HBC would have been different from the Univision/HBC merger because it called for the combined company to sell off many of its radio stations to keep competition healthy. Assuming the SBS/HBC merger would have had no detrimental effect on competition, would not the Univision/HBC deal, if anticompetitive problems arise, also require a sell off of the necessary number of stations similar to the SBS/HBC deal? Moreover, based on SBS's statements, it appears that consumers may benefit from HBC and CC's actions because those actions will keep the prices for the advertiser-the buyer in this antitrust analysis-low.

The injury to competition element is a critical element of both Sections One and

Two because it prevents heated business disputes between individual competitors from turning into federal antitrust actions. The Sherman Act was enacted as an aegis to protect the consumer and competition, not as a sword to redress grievances against competitors. It appears that in its haste to assert a federal antitrust claim against CC and HBC, SBS has lost sight of the most important player in this case-the consumer.

The Plaintiff has amended its complaint once already. The Court gave the Plaintiff extensive time to address the injury to competition element at oral argument. Still, SBS could only provide one vague and conclusionary allegation of injury to general competition. As Judge Conway noted in *Aquatherm:*

> [w]hen the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing case-load of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint. 971 F.Supp. 1419, 1424 (M.D.Fla.1997) (quotation omitted).

Based on the events SBS has related, SBS may or may not have a state law claim against HBC and CC. However, its remedy is not founded in federal antitrust law. Therefore, dismissal of the federal antitrust claim with prejudice is proper.

## IV. *State Law Claims*

Having dismissed the federal claims, the Court will dismiss the remaining state law claims without prejudice.[23] "When all federal claims are eliminated in the early stages of litigation, the balance of factors

generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them *without* prejudice." *Tops Markets,* 142 F.3d at 103 (emphasis in original) (citation omitted); *see, e.g., General Cigar,* 205 F.Supp.2d at 1357–58 (declining to exercise supplemental jurisdiction after dismissing federal antitrust claims that were the only basis for federal jurisdiction).

Therefore it is

ORDERED that Defendant Clear Channel Communications Inc.'s and Hispanic Broadcasting Corporation's Motions to Dismiss Counts I and II are GRANTED WITH PREJUDICE.

IT IS FURTHER ORDERED that Spanish Broadcasting System's state law causes of action (Counts III–XI) are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that this CASE is CLOSED and all pending motions are DENIED as MOOT.

---

**23.** There is no diversity of citizenship under 28 U.S.C. § 1332 because all the parties were Delaware corporations.